


**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JEFFREY A. KRALLER** and **ALAN POLLENZ**, | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 3:03-CV-761-P |
| **ALLIED PILOTS ASSOCIATION**, a Labor Organization, | § | |
| Defendant. | § | |

**RESPONSE TO SURREPLY BRIEF**

TO THE HONORABLE JUDGE JORGE SOLIS:

Plaintiffs Jeffrey J. Kraller and Alan Pollenz respond to the sur-reply filed by defendant relating to the application for a preliminary injunction.

Defendant does not deny that its discipline against plaintiffs was motivated by an unlawful retaliatory intent, and it does not respond in any other way to the evidence of retaliation. Internal union trial proceedings conducted as a pretext to snuff out a recall campaign against the union's president violates the "fair hearing" requirement of section 101(a)(5).[1] *Perry v. International Longshoremen's Association*, 638 F. Supp. 1441, 1446 (S.D.N.Y. 1986).

### *A. Defendant Continues to Rely on Non-Witness Hearsay Assertions for Its Claim That "Some Evidence" Supports the Disciplinary Action.*

Defendant offered no affidavits in response to the verified complaint. John Bury's verification of the opposition brief compels the reader to guess what it does and does not en-

1 Such evidence also establishes an independent cause of action under LMRDA, section 101(a)(2), as a free speech violation. Plaintiffs may amend the complaint to add a claim under section 101(a)(2).

compass; it is no substitute for an affidavit. And there are no affidavits in response to the affidavits that plaintiffs filed in reply to the defendant's opposition.

Defendant repeatedly accuses plaintiffs of "breaking into a secure database off limits to regular members." The assertion grossly misstates what happened. There is only one membership database: the one that all members -- including plaintiffs, until April 15, 2003 -- may access by using their member-at-large pass codes. Plaintiffs did not "break in" to the database. Whether 25 or 2,500 per day, the e-mail addresses that they sought to retrieve were the same e-mail addresses that were accessible to every member.

Nor, except as to data marked by members to be kept private, was access to membership data "off limits." Defendant continues stubbornly to rest its case on the faulty factual premise that, in using Captain Schafer's pass code, plaintiffs *intended* to access the confidential data, although there is no evidence of such intent, and all of the affirmative evidence shows that their access to confidential data was accidental. At the time that plaintiffs used Schafer's pass code, they assumed that it belonged to *Jason Goldberg*—a member-at-large.[2] Plaintiffs themselves were members-at-large, having no reason to know that a committee chair's pass code accessed confidential data. Captain Kraller thanked First Officer Goldberg for the pass code, but there is no evidence at all that he understood that Schafer's pass code accessed confidential data. Goldberg himself has testified that *he* did not know, when he loaned the pass code to Captain Kraller, that it accessed confidential membership data. App. 11, ¶ 3.

In two briefs, defendant has asserted that Captain Kraller "did not personally know, or ***want to know***, if Schafer had authorized" use of his pass code. But neither brief provides the re-

2 "[W]hen I signed in, I saw Glenn Shafer's name instead of Jason Goldberg's. And I said, well, this isn't Jason's password; what's up...." App. 2.

quired citation to the hearing transcript for the claim—suggesting a guilty mind—that Kraller did not "want to know" if Schafer had authorized such use. The hearing transcript may be searched in vain for the claimed evidence; it is not there. Plaintiffs have shown all that they are required to show to establish apparent authority: Goldberg assured Kraller that his use of the pass code to gather e mail addresses unburdened by the numerical quota was authorized, in response to Kraller's appeal to supporters of the recall campaign for help in retrieving e mail addresses. App. 10, 11, ¶¶ 2, 3. When Kraller discovered that the code was not Goldberg's, but Schafer's, he thought nothing of it, since Goldberg and Schafer were known to be good friends, and both were supporters of the recall campaign.[3]

Captain Schafer's declaration affirmatively establishes that plaintiffs' use of his pass code to gather non-confidential e-mail addresses *was* within the scope of the authorization that Schafer had given to Goldberg, and was therefore authorized. App. 32, ¶¶ 5-8. Had plaintiffs been afforded the opportunity to cross-examine Schafer at the hearing, as was their due process right,[4] the hearsay assertions in defendant's brief about use of Schafer's pass code, on which plaintiffs were convicted, would have been thoroughly explored. Defendant revealed that it understood the importance of calling Schafer as a hearing witness by trying to persuade Schafer to provide a *post*-hearing affidavit -- *i.e.,* to provide evidence, but without opportunity for cross ex-

---

[3] "...Glenn Schafer [is] up there front and center as one of the major supporters of the recall of John Darrah.

So I assumed that Glenn Schafer had given Jason the – they are good buddies – his password to give to me at arm's length.... Alan and I took it on faith that Glenn Schafer knew about this, that he had passed it to Jason Goldberg, and Jason had passed it to us. And, I mean, that's about as straightforward as I can be about the issue here." App. 2, 3.

[4] *Parks v. International Brotherhood of Electrical Workers,* 314 F.2d 886, 912 (4th Cir.), *cert. denied,* 372 U.S. 976 (1963); *Perry v. ILA, supra,* 638 F. Supp. at 1446; Summers, *The Law of Union Discipline: What the Courts Do in Fact,* 70 YALE L.J. 175, 200-06 (1960); Cox, *The Role of Law in Preserving Union Democracy,* 72 HARV. L. REV. 609, 616 (1959).

amination. App. 32, ¶ 8. Defendant not only deprived plaintiffs of their right to cross-examine Schafer at the hearing, but, it seems, defendant did so quite deliberately.

In sum, the plaintiffs admittedly intentionally circumvented the numerical quota, but that action has not been found to be wrongful. There is no evidence that they intentionally or knowingly accessed confidential data, or that they ever used or saved any such data. There is no evidence of any intentional wrongdoing.

***B. Defendant's Sur-Reply Regarding Exhaustion of Internal Remedies Studiously Avoids Plaintiffs' Points.***

Title I is designed to enable members to enforce their Title I rights *without* being burdened by legal fees for enforcement proceedings. *Hall v. Cole,* 412 U.S. 1, 8 (1973). Section 101(a)(4) is consistent with this scheme, explicitly permitting *only* exhaustion of *internal* union remedies -- *i.e.,* remedies that do not impose the burden of legal fees. To plaintiffs' knowledge, there is no precedent under section 101(a)(4) that recognizes formal third-party arbitration proceedings as an "internal" union remedy. By definition, formal arbitration is an *external* remedy, and it typically carries the burden of legal fees, with each party bearing the cost of its own legal fees. Fees may be recovered *only* in a private lawsuit under Title I, *but the very purpose of an exhaustion rule is to avoid such judicial recourse.*

The defendant's "internal" union remedy thus requires members to waive their Title I right to recover attorney fees for the remedying of the violation. As a matter of law, such an "internal" union remedy ought not to be allowed as a permissible exhaustion requirement under section 101(a)(4), because it denies members their right under *Hall v. Cole* to recover attorney fees incurred in defending their Title I rights. To plaintiffs' knowledge, the instant lawsuit is the first time a union has asked a court to impose an external remedial scheme as a substitute for an internal union remedy under section 101(a)(4), as well as the first time that typically fee-

generating proceedings would be imposed as a substitute for internal remedies, without recourse for recovering fees.

Thus, it is untrue that plaintiffs would have suffered "no injury" had they submitted to formal arbitration of their Title I claims, because, had they prevailed in arbitration, they would not have been entitled to reimbursement for attorney fees incurred to protect themselves from impermissible discipline. And they would have had no legal recourse to recover those fees.

While plaintiffs believed that they were not legally compelled to relinquish their rights under Title I to recover their attorney fees under *Hall v. Cole,* they nevertheless offered to submit to third-party arbitration, in an effort to keep this dispute out of court. They attached reasonable conditions to their offer, to assure the fairness and impartiality of the arbitration case[5] and also to assure that the dispute would be resolved on its merits, rather than on whether Captain Pollenz had forfeited his appeal rights. To have exhausted arbitration, only to lose on such a procedural ground, plaintiffs would have exhausted their financial reserves for financing this lawsuit, before filing it.

Defendant does not *now* challenge the reasonableness of plaintiffs' conditions. But, while the parties were attempting to resolve this dispute without recourse to court, defendant repeatedly avoided responding to plaintiffs' conditions, leaving all of them "up in the air"—presumably to be resolved in the arbitration proceeding itself, which was precisely what plaintiffs sought to avoid. Plaintiffs ultimately, then, declined to participate in a third-party proceeding that was *not* an internal union remedy, and therefore not contemplated by section 101(a)(4), and that was in-

[5] No arbitrators, including labor arbitrators, have any occasion to be familiar with LMRDA principles. Labor arbitrators enforce collective bargaining agreements, which do not present LMRDA disputes. Since there was no particular advantage to be gained by retaining a labor arbitrator, plaintiffs requested that the arbitration panel include no labor lawyers, to remove the risk of institutional bias.

capable of resolving the dispute within four months—another observation that defendant has not challenged.

Although defendant offered no *internal* union appeal, that plaintiffs might arguably have had a duty to exhaust, plaintiffs strenuously attempted to resolve the dispute out of court, at substantial monetary cost to themselves, only to discover, when they thought settlement had been reached, that the defendant had never budged from its original position. App. 9.

### *C. Defendant's Current Interpretation of Its Constitution Is Patently Unreasonable.*

Defendant's amendment of its constitution on November 7, 2002, expanding the three forms of discipline to include "disciplinary action, including but not limited to fine, suspension, or expulsion ....," Verified Compl., PX "D" (emphasis in original), showed that defendant itself believed that its pre-amendment constitution ("Any member is subject to fine, suspension, or expulsion ...") did not authorize disciplinary action less than fines, suspension, or expulsion. That is why it amended its constitution. Defendant does not argue otherwise. Instead, defendant brazenly argues that the Court is compelled to accept its *post-litigation* "interpretation"—even though this litigation posture directly contradicts defendant's *own* interpretation of its constitutional disciplinary powers on November 7, 2002.

There is no rule of law that would require such an arbitrary and capricious result. Defendant's interpretation of the scope of judicial review would reduce to a mere formality this Court's jurisdiction under section 301, see *Wooddell v. International Brotherhood of Electrical Workers, Local 71,* 502 U.S. 93 (1991), to resolve disputes about the interpretation of union constitutions. *Perry v. International Longshoremen's Association,* 638 F. Supp. 1441, 1446 (S.D.N.Y. 1986). While courts are required to defer to a union's *reasonable* interpretation of its constitution, defendant's current posture is patently unreasonable. As defendant concedes, this

Court may reject a union's interpretation of its constitution that is patently unreasonable. Defendant's current interpretation of its pre-amendment constitution is patently unreasonable, as contrary to its pre-litigation interpretation of that same language, as well as to principles of contract interpretation requiring meaning to be given to the November 7, 2002 amendment. Plaintiffs' Reply Brief, at 7.

This Court may and should accept the defendant's *own* interpretation of its constitution. By the act of amending Article VII on November 7, 2002 to add authority to impose discipline less than fines, suspensions, or expulsion, defendant *admitted* that its pre-amendment constitution failed to authorize disciplinary action less than fines, suspension, or expulsion. Plaintiffs ask the Court only to adhere to the defendant's *own* interpretation of its constitution, and to strike down the discipline that was authorized only by an *ex post facto* constitutional amendment.

## CONCLUSION

Plaintiffs respectfully ask this Court to preliminarily enjoin defendant to restore the *status quo ante* by removing the bar on plaintiffs' access to all members-only areas of the official web site.

Respectfully submitted,

BARBARA HARVEY
Penobscot Building, Suite 3060
645 Griswold Street
Detroit, Michigan 48226
Telephone: (313) 963-3570
Facsimile: (313) 963-3572
Email: barbaraharvey@comcast.net

STEPHEN GARDNER
Texas State Bar No. 07660600
Law Office of Stephen Gardner, PC
6060 North Central Expressway, Suite 560
Dallas, Texas 75206
Telephone: 214/800-2830
Telecopier: 214/800-2834
Email: steve@consumerhelper.com

Attorneys for Plaintiff,
By:

STEPHEN GARDNER

**Certificate of Service**

A copy of the foregoing was served on counsel of record for defendants by facsimile to the fax numbers below and by first-class mail to the following addresses, on April 25, 2003:

Thomas H. Geoghegan
Despres, Schwartz & Geoghegan
77 West Washington Street, Suite 711
Chicago, IL 60602-2803
FAX:(312) 372-7391

Sanford R. Denison
Baab & Denison, LLP
Stemmons Place, Suite 1100
2777 N. Stemmons Freeway
Dallas, TX 75207
FAX: (214) 637-0730

Stephen Gardner

Dated: April 25, 2003