

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK, U.S. DISTRICT COURT

By _____
             Deputy

| | | |
|---|---|---|
| JEFFREY A. KRALLER and ALAN POLLENZ, | § § § | |
| Plaintiffs, | § § | Civil Action No. 3 03CV--761P |
| v. | § § § | BRIEF IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION ON THE AMENDED COMPLAINT |
| ALLIED PILOTS ASSOCIATION, a Labor Organization, | § § § § § | |
| Defendant. | § | |

Stephen Gardner
Texas State Bar No. 07660600
Law Office of Stephen Gardner, PC
6060 North Central Expressway, Suite 560
Dallas, Texas 75206
Telephone: (214) 800-2830
Facsimile: (214) 800-2834

Barbara Harvey
Admitted *pro hac vice*
Penobscot Building, Suite 3060
645 Griswold Street
Detroit, Michigan 48226
Telephone: (313) 963-3570
Facsimile: (313) 963-3572

Attorneys for Plaintiffs,

BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Table of Authorities ................................................................ i

I.      Introduction ................................................................. 1

II.     Supplemental Statement of Facts ........................................ 1

III.    Argument .................................................................... 7

    A.  Plaintiffs Were Disciplined for the Unlawful Purpose of
       Suppressing Their Criticism of and Efforts to Recall Darrah
       From Office ............................................................ 7

        1.  The Defendant Has Repudiated and Modified Its
           Accusations, After Removing Plaintiffs' Access to
           Its Web Site, Without Voiding the Disciplinary Action ... 7

        2.  Defendant Disciplined Plaintiffs for Conduct That It
           Knowingly Tolerated in Others and Engaged in Itself,
           as Official Union Policy ........................................ 8

        3.  Defendant Disciplined Plaintiffs Despite the Absence
           of an Applicable Union Rule .................................. 12

    B.  Plaintiffs Are Now Suffering Deprivation of Membership
       Rights Based on Accusations Different Than Those Made
       in the Charges on Which They Were Tried and Found Guilty ...... 14

IV.     Conclusion .................................................................. 19

Certificate of Service .............................................................. 20

Second Supplemental Appendix:

PX "J"    Current postings to members-only official members' forum
        by non-member

PX "K"    APA's Acceptable Use Policy

Declaration of Captain David Bates (original previously filed)

Declaration of Captain J. Daniel Grever (original previously filed)

**TABLE OF AUTHORITIES**

**Cases:**

*Addison v. Grand Lodge of the Int'l Ass'n of Machinists,*
  300 F.2d 863 (9th Cir. 1962) ..................................................    18

*Airline Maintenance Lodge 702, International Association of Machinists*
  *v. Loudermilk,*  444 F.2d 719 (5th Cir. 1971) ............................    10

*Allen v. International Alliance of Theatrical, Stage Emp. and Moving*
  *Picture Mach. Operators of U. S. and Canada, AFL-CIO,*
  338 F.2d 309 (5th Cir. 1964) ................................................    17

*Bise v. IBEW Local 1969,* 618 F.2d 1299 (9th Cir.1979),
  *cert. denied,* 449 U.S. 904 ...................................................    11

*Black v. Ryder/P.I.E. Nationwide, Inc.,* 970 F.2d 1461 (6th Cir. 1992) .......    10, 11, 12

*Bradford v. Textile Workers Local 1093,* 563 F.2d 1138 (4th Cir.1977) ......    10, 12

*Canfield Aviation, Inc. v. National Transportation Safety Board,*
  854 F.2d 745 (5th Cir.1988) ..................................................    19

*Carothers v. McCarthy,* 705 F.Supp. 687 (D.D.C.1989) ........................    13

*Fulton Lodge No. 2, International Association of Machinists v. Nix,*
  415 F.2d 212 (5th Cir. 1969), *cert. denied,* 406 U.S. 946 (1972) ......    10, 13

*Gleason v. Chain Service Restaurant,* 300 F.Supp. 1241 (S.D.N.Y. 1969) ...    18

*International Brotherhood of Boilermakers v. Hardeman,*
  401 U.S. 233 (1971) ...........................................................    11, 14

Jacques *v. Local 1418, International Longshoremen's Association,*
  246 F. Supp. 857 (E.D. La.1965), *aff'd,* 404 F.2d 703 (5th Cir. 1969) .    18

*Kuebler v. Cleveland Lithographers and Photoengravers Union*
  *Local 24-P,* 473 F.2d 359 (6th Cir. 1973) ..................................    10

*Leonard v. M.I.T. Employees' Union,* 225 F.Supp. 937 (D. Mass. 1964) .....    13

*Maceira v. Pagan,* 649 F.2d 8 (1st Cir. 1981) ....................................    13

*Mallick v. International Brotherhood of Electrical Workers,*
  644 F.2d 228 (3d Cir.1981) ...................................................    6, 10

*Morrissey v. National Maritime Union of America,*
    544 F.2d 19 (2d Cir. 1976) .................................................    13

*Petramale v. Local No. 17, Laborers International Union of North*
    *America,* 736 F.2d 13 (2d Cir. 1984) ......................................    11, 12

*Ruocchio v. United Transportation Union, Local 60,*
    181 F.3d 376 (3rd Cir. 1999) ................................................    6, 10

*Salzhandler v. Caputo,* 316 F.2d 445 (2d Cir.),
    *cert. denied,* 375 U.S. 946 (1963) .........................................    12

*Sheet Metal Workers' International Association v. Lynn,*
    488 U.S. 347(1989) .............................................................    10, 11

*Steelworkers v. Sadlowski,* 457 U.S. 102 (1982) ..................................    10, 11, 13

**Statutes:**

LMRDA, section 101(a)(2), 29 U.S.C. § 411(a)(2) .................................    passim

LMRDA, section 101(a)(5), 29 U.S.C. § 411(a)(5) .................................    10-11, 19

LMRDA, section 401(g), 29 U.S.C. § 481(g) .......................................    3

**Treatises:**

J. Etelson and F. Smith, *Union Discipline under the Landrum- Griffin Act,*
    82 HARV.L.REV. 727, 741-43 (1968) .........................................    18

M. Malin, INDIVIDUAL RIGHTS WITHIN THE UNION .................................    13

# I. INTRODUCTION

Following the status conference, plaintiffs filed a verified amended complaint, adding free speech claims under LMRDA, section 101(a)(2), and they have now supplemented the amended complaint with additional affidavit testimony, described below. Plaintiffs' claims under section 101(a)(2) are that they were disciplined for the unlawful purpose of suppressing their criticism of president Darrah and their recall campaign against him, and not for violating any constitutional prohibition or union rule.

This brief addresses the merits of plaintiffs' new claims and the implications of the defendant's changing position. Plaintiffs maintain their request for an evidentiary hearing in the event the Court finds their written submissions insufficient to warrant the restoration of their full membership rights.

## II. SUPPLEMENTAL STATEMENT OF FACTS

The written record before the Court now includes the following evidence:

1. The APA's own officers and representatives have, over an extended period of years, repeatedly and methodically gained access to huge amounts of data in the limited access, confidential AMR data base by using its members' pass codes to circumvent the carrier's restrictions on access. Bates decl.(see below); Grever decl. (see below); Verified Amended Complaint ¶¶ 47(b), (e).[1] As a matter of official union policy, defendant "broke into" employer data under precisely the same "false pretenses" as defendant now cites as justification for barring plaintiffs from the members-only areas of the official web site.

A former officer and member of the APA's Board of Directors, who also served as both a member and the chair of the Communications Committee, has testified that the APA's Technical Research and Analysis Committee solicited his and "dozens" of other

---

[1] Defendant has denied these verified allegations in its Answer.

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 1**

members' and chairs' Sabre system[2] pass codes in 1993, for the purpose of using them to harvest data from the AMR data base under what the APA now characterizes as "false pretenses." Declaration of David Bates, ¶¶ 3, 4, 7, 9. He authorized such use of his Sabre pass code over the course of the next three years, and the APA harvested massive amounts of data from the AMR data base by using his pass code, reimbursing him for a total of $13,855.38 for billable access time in excess of his monthly allocation. *Id.* ¶¶ 8, 9.

The APA's purpose was to "mine" AMR data faster and more efficiently than was otherwise possible, by using multiple simultaneous "log-ins" under many members' pass codes. *Id.* ¶ 7. The APA mined data from the AMR data base under pass codes not belonging to the actual users as a matter of official union policy, over a period of years through the 1990's. Bates decl. ¶ 10; Grever decl. ¶ 4.

The National Deputy chair of the APA's Strike Preparedness Committee for seven years, until last year, has testified that for a period of four years in the late 1990's, as a matter of official APA policy, his committee also solicited members for their pass codes and methodically used those pass codes to "mine" confidential member data from the AMR data base in quantities that would have been otherwise impossible for the APA to harvest. Declaration of J Daniel Grever, ¶¶ 3, 4. He further testified that one of the APA's purposes in using numerous pass codes to access the data was to evade the AMR's discovery of such massive data recovery. *Id.* ¶ 5.

Until now, "[t]here has never been any question about the propriety of this practice of accessing the company's data base under identities other than the users' identities, under the APA's constitution or any of its official policies." Bates decl. ¶ 10. Obviously, there is no rule or policy against gaining access to restricted web sites under another member's pass code, because precisely such internet access has been standard

---

[2] The AMR data base, portions of which are made pass code-accessible to employees.

practice for years, as a matter of official union policy. The *only* policy on such access has *endorsed* such access.

2. After this lawsuit was filed, and after the APA's board voted to authorize the prosecution of the charges against the plaintiffs in this lawsuit, Gary Boettcher, a current APA officer and member of that same board, acting in his official capacity, abused his "unlimited access" pass code privileges to gain access to confidential APA membership data for the purpose of sending that *confidential* data, which was clearly tagged as confidential, to his entire domicile membership, under an exhortation to send harassing e mails to that member's confidential e mail address. Boettcher knowingly misinformed his members that the e mail address was *not* confidential. The targeted member, Jason Goldberg, had just filed an affidavit for the plaintiffs in a recently filed lawsuit challenging the ratification procedures on the recently approved concessionary agreement. App. 11 - 12 - Goldberg decl. ¶¶ 5 - 9, 11 - 12 and exhibits.

3. As the defendant has now admitted, other members have in the past harvested *all* nonconfidential APA membership data for their own unofficial political purposes, without suffering any disciplinary consequences. App. 5 - PX "H," at 83; Verified Amended Complaint ¶ 47.c; Answer ¶ 47.c. The APA knew about – but failed to prosecute -- these full downloads before it prosecuted the plaintiffs for evading its programmed limits on at-large member access. If the APA condones the downloading of the entire nonconfidential membership data base by officers having unrestricted pass codes, but punishes at-large members for doing so, its disciplinary policy violates the LMRDA's election provisions, which bar such union support for incumbent candidates. 29 U.S.C. § 481(g).

Was the distinction between these other admitted "global" downloads and the plaintiffs' downloads that plaintiffs performed some of their downloading under another person's access code? If so, then the APA is guilty of the same offense, on a much vaster scale and over a much longer period of time. See ¶1, *supra.* Plaintiffs violated no union

BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 3

rule by accessing restricted web sites using another member's pass code.

Then, was the distinction simply that plaintiffs, as at-large members, accessed the entire data base, including e mail addresses marked as private, for which only elected and appointed union representatives are issued pass codes?[3]  If so, then plaintiffs were disciplined for an action that was unintended, unknowing, and inadvertent, leading to a result that they did not desire, and which they immediately remedied upon discovery. There is *no* contrary evidence.  No known union rule or constitutional provision authorized the defendant to deprive members of their membership rights for engaging in unintentional acts, having undesired consequences.  Such punishment is arbitrary and capricious.

4. As now admitted by the defendant, the defendant's action against the plaintiffs was the first disciplinary action imposed by the defendant against any members, for any reason, in approximately a decade.  Amended Verified Complaint ¶ 47.i and Answer; App. 7 - PX "H," at 117; App. 32 - 33 - Schafer decl. ¶ 9.  *During that time, it was common for members to compile e mal lists for unofficial purposes, by using other members' pass codes.*  App. 11 - Goldberg decl. ¶ 4; ¶ 3, *supra*; see App. 32 - Schafer decl. ¶ 5.  Also during that time, misbehaving officers and members went undisciplined, although they caused devastating injury to the Association: $45,500,000 in civil contempt liability for compensatory damages, surely more serious misconduct than the plaintiffs' actions.  App. 32 - 33 - Schafer decl. ¶ 9.

That plaintiffs were evicted from the members' official internet forum for engaging in a practice that in the past was never punished, or even criticized, shows that they were not punished for also engaging in that practice, but to interfere with their recall campaign.

---

[3] Even on this basic matter of controlling access to membership data marked as private, an appeal board member volunteered on the record that he had never seen a rule or policy establishing such access privileges, and was first informed of the APA's policies at the hearing.  Supp. App. 127 - 28.

BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 4

5. While this lawsuit is pending, a member's spouse, who admits that she is not a member, is openly posting messages on the members-only official internet forum ("Challenge & Response"), using her husband's access code and employee number to gain access, for the purpose of participating in debates about recent contract concessions. See PX "J" (attached). According to her postings, she is accessing the members-only forum with her husband's knowledge and active cooperation. His conduct, in giving his pass code to a non-member for the purpose of allowing the non-member access to C&R, unlike any of the plaintiffs' intentional acts, violates an existing union rule: "APA Challenge & Response Forums are limited to active and retired members in good standing of the Allied Pilots Association." PX "K" - APA Acceptable Use Policy § 12 (attached).

6. Article VII of the APA constitution prohibits "disseminat[ion of] any information pertaining to a pending Article VII case before all available appeals have been exhausted or the time limit for any appeals have expired." Verified Complaint, Exh. A, at 22. In violation of this clear constitutional prohibition, defendant circulated to members a "blast e mail" that described the charges against the plaintiffs and attacked and discredited them, before the trial proceeding. Amended Verified Complaint ¶ 47.j.

This was the only official APA communication that plaintiffs ever saw, over the course of more than a decade, that described the substance of charges against a member, although charges were filed against other members during that time period. *Id.* That the defendant sent the entire membership an unprecedented message, informing members about Article VII charges against the plaintiffs and attacking and discrediting them, shows that the defendant wanted plaintiffs to be discredited by the charges, presumably to cast a shadow on their recall campaign.

7. To empower the appeal board to impose a punishment upon the plaintiffs that would be sufficiently lenient and focused to avoid "backfiring" politically by making martyrs of plaintiffs, the APA amended its constitution, expanding the disciplinary

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 5**

powers of the appeal board, *after* filing the charges, and the appeal board relied on this amendment to the constitution to impose such *ex post facto* punishment on the plaintiffs. Verified Amended Complaint ¶ 47.d; PX "A," at 19; PX "B," "D," "E." If the purpose of the charges had not been political, the Board would have had no particular cause for concern about the severity of the disciplinary action, since it would have been *more* appropriate, and lawful, to punish plaintiffs with the more severe disciplinary measures actually specified by the constitution that they were accused of violating.

8. After Captain David Bates sent a political mailing to the entire San Francisco membership in 1990-91, as part of a campaign to oust the incumbent domicile chair and vice chair, the incumbents lost the election. Bates was charged by the losing incumbents under Article VII. He was not charged for using the APA membership list for his own unofficial political purposes – which apparently at that time was an unquestioned right. Rather, he was charged for sending to the members critical remarks about the incumbents – an absolutely protected free speech right under the LMRDA. Bates decl. ¶ 11. After three trial and appellate proceedings, including an appeal to AAA arbitration, the charges were dismissed as outside the jurisdiction of Article VII. *Id.*

At the time Bates was prosecuted a decade ago, it had been the law under Title I, for a decade before then, that the mere *prosecution* of charges such as were filed against Bates unlawfully chills union members' free speech rights, even if the conviction is reversed in the course of internal union appeals. *Mallick v. International Brotherhood of Electrical Workers,* 644 F.2d 228 (3d Cir.1981). *See Ruocchio v. United Transportation Union, Local 60,*181 F.3d 376, 386 (3rd Cir. 1999), holding that a Title I lawsuit challenging the prosecution of such unlawful internal charges was not mooted by reversal of the conviction by the union appellate body, because the chilling of other members' willingness to engage in dissent, that was caused by the reversed prosecution, was an independent injury warranting injunctive relief.

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 6**

## III. ARGUMENT

**A. Plaintiffs Were Disciplined for the Unlawful Purpose of Suppressing Their Criticism of and Efforts to Recall Darrah From Office.**

*1. The Defendant Has Repudiated and Modified Its Accusations, After Removing Plaintiffs' Access to Its Web Site, Without Voiding the Disciplinary Action.*[4]

Since this lawsuit was filed, the defendant has made at least two substantial changes in its accusations against the plaintiffs:[5]

1. It has repudiated the accusation in its charges that plaintiffs engaged in misconduct by evading the numerical daily quota on the downloading of members' e mail addresses by at-large members, and it denies that plaintiffs were disciplined on this aspect of the charges against them.

2. It has modified its "false pretenses" charge. The accusation in the charges was that plaintiffs gained access to data to which they would have had no access themselves, as at-large members, by using a committee chair's pass code without his authorization. The modified accusation, clearly stated only at the status conference, off the record, was that plaintiffs' offense lay simply in accessing restricted data under another person's pass

---

[4] The factual basis for this argument is set forth in full detail in Part B, *infra*.

[5] The APA, in its Answer, also denies that the charges were brought by the Association. Ans. ¶ 44(*l*). The denial is expressly contradicted by the defendant's written representations. The charges state on their face that they were filed "[o]n behalf of the Association." They were signed by John Bury, in his official capacity as the Association's secretary-treasurer. They were filed on official letterhead. Verified Complaint Exh. "B." Bury reiterated to the appeal board in his opening remarks that the charges were filed on behalf of the Association: "*On behalf of the Association*, I have this unfortunate duty of lodging Article 7 charges ...." Supp. App., PX J, at 13 (emphasis added).

Attribution to the APA of the accusations made in the charges does not affect the due process analysis, because, as a matter of due process, a disciplinary action based on conduct that was held by the trial body to be misconduct, but that is later authoritatively admitted not to be misconduct, should be vacated, as fatally flawed. On the other hand, attribution to the APA of the accusation made in the charges *does* affect plaintiffs' retaliation claims, as relevant to the issue of the *defendant's* purpose or intent in prosecuting the charges. That the APA now denies responsibility for the charges, despite the documentation showing just the opposite, shows that the APA seeks to conceal that its position on the merits has substantially changed since the charges were filed.

BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 7

code.

Nothing in the APA's prosecution of the charges suggested that plaintiffs' evasion of the numerical quota was perceived by the defendant, *at that time,* as anything less than a goodly chunk of the case against the plaintiffs. It cannot be argued now, after the appeal board's decision, that the appeal board's decision would have been unaffected by the APA's repudiation of this charge, had the repudiation been timely made, on the appeal board's hearing record, before its decision. For the APA to make such an argument would implicitly admit that the Association's hearing procedure was not an unbiased and impartial proceeding, but one in which the actual accusations and evidence was substantially immaterial -- *i.e.,* a result-oriented charade. So instead, having accomplished its objective, the APA cavalierly and without explanation simply dropped its accusation after plaintiffs sued.

That the APA abandoned one of its principal accusations and substantially modified another, *after* depriving plaintiffs of access to communications with fellow members and officers on the official web site, *but without vacating that disciplinary action,* demonstrates that the purpose of the disciplinary action was not to punish plaintiffs for engaging in the conduct charged, but, instead, to deprive them of access to the official web site. If defendant seriously intended to punish plaintiffs for committing the conduct as charged, it would have vacated the disciplinary action after withdrawing its position that the conduct charged did not constitute misconduct. Vacating the discipline is the only principled response to the recognition that the discipline rests, in some immeasurable part, on a meritless accusation.

2. *Defendant Disciplined Plaintiffs for Conduct That It Knowingly Tolerated in Others and Engaged in Itself, as Official Union Policy.*

Plaintiffs have filed a written record showing that they were stripped of their access to electronic communications with fellow members on the official web site for engaging in conduct that has been widespread within the Association's culture for many

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 8**

years, both by the membership and by the APA's own governing body, as a matter of official policy.  Yet only plaintiffs were disciplined.

The APA cited no union rule to justify the discipline.  In fact, it admitted on the appeal board hearing record that the numerical limit on at-large members' access to the data base was not established in any official policy, and it repudiated this accusation after suit was filed.  It disciplined plaintiffs immediately after they launched an internet-based recall campaign against president Darrah.  The discipline was a narrowly focused punishment that consisted of depriving plaintiffs of access to internet-based communications with other members in the members' official web forum.  To impose this pin-pointed discipline, the Association was compelled to amend its constitution and enforce it against plaintiffs *ex post facto.*  By holding up the plaintiffs to public shame and humiliation in an unprecedented communication to the entire membership about the charges -- in violation of the constitution -- the APA"chilled" other members from engaging in similar internal union political activity.  These facts show that the defendant's purpose was not to impartially enforce its constitution, but to sabotage plaintiffs' recall campaign, even if doing so required the APA itself to violate the constitution in its effort to demean the plaintiffs.

Section 101(a)(2) broadly protects members' rights to "express *any* views, arguments, or opinions" within the Union.[6]     29 U.S.C. § 411(a)(2).  Congress "intended § 101(a)(2) to restate a principal First Amendment value--the right to speak

---

[6]*Freedom of speech and assembly.* Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 9**

one's mind without fear of reprisal." *Steelworkers v. Sadlowski,* 457 U.S. 102, 111 (1982); *Fulton Lodge No. 2, International Association of Machinists, etc. v. Nix,* 415 F.2d 212, 218 (5th Cir. 1969), *cert. denied,* 406 U.S. 946 (1972) (Godbold, J.), *cited with approval, Hall v. Cole,* 412 U.S. 1, 8 (1973); *Ruocchio v. United Transportation Union, Local 60,*181 F.3d 376, 387 (3rd Cir. 1999) ("we [have] reiterated in broad and expansive terms the need for the courts to entertain, and enjoin, union exercise of power that chills speech protected by the LMRDA"); *Mallick v. International Brotherhood of Electrical Workers,* 644 F.2d 228 (3d Cir.1981); *Kuebler v. Cleveland Lithographers and Photoengravers Union Local 24-P,* 473 F.2d 359 (6th Cir. 1973). Of all of the rights protected in Title I's Bill of Rights for Union Members, "the right of free speech enjoying a particularly favored position." *Airline Maintenance Lodge 702, International Association of Machinists and Aerospace Workers v. Loudermilk,* 444 F.2d 719, 723 (5th Cir. 1971).

Speech that is afforded the greatest protection within unions is political speech, such as the plaintiffs' recall campaign. "Congress also recognized that [free speech] is particularly critical, and deserves vigorous protection, in the context of election campaigns. For it is in elections that members can wield their power, and directly express their approval or disapproval of the union leadership." *Sadlowski, supra,* 457 U.S. at 112.

Removal from elective office on the basis of the officer's speech is unlawful under Title I, even though Title I recognizes no right to retain any union office, appointed or elected. Among other reasons, this rule reflects the Supreme Court's concern that elected officers, as well as the members who elected them, would be chilled in exercising their free speech rights if they may speak out only at risk of being stripped of their office. *Sheet Metal Workers' International Association v. Lynn,* 488 U.S. 347, 354 (1989).

Whether the purpose of the disciplinary action is directly manifest or only circumstantially so, if the evidence shows an unlawful purpose to suppress dissent, the

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 10**

discipline is unlawful. *Black v. Ryder/P.I.E. Nationwide, Inc.,* 970 F.2d 1461, 1467-69 (6th Cir. 1992). The plaintiff's burden of proof has been described variously as showing that his exercise of free speech rights played "a substantial part" in the disciplinary action, *Black, supra,* 970 F.2d at 1469, or simply that "protected speech was 'a' cause " or "one of the causes" of the adverse action, *Bradford v. Textile Workers Local 1093,* 563 F.2d 1138, 1143 (4th Cir.1977); *Petramale v. Local No. 17, Laborers International Union of North America,* 736 F.2d 13, 18 (2d Cir. 1984). Upon the required showing, the burden shifts to the union to prove by "a preponderance of the evidence that what [it] did was a result of the adoption and enforcement of reasonable rules." *Black, supra.*

Under section 101(a)(2), unlike section 101(a)(5), it is immaterial that "some evidence" may support the disciplinary action. If the purpose of the discipline was to suppress dissent, it is unlawful:

> As the Supreme Court has repeatedly made clear, the free speech and due process provisions of the Act are separate and independent. *Sheet Metal Workers' International Ass'n v. Lynn,* 488 U.S. 347, 354-55 (1989). A union may not infringe on free speech rights under § 411(a)(2), even if it abides by all of the due process provisions when disciplining a member for protected activity. 29 U.S.C. § 411. *Boilermakers* does not apply here because that case did not involve a free speech issue. Other courts have also rejected the claim that the "some evidence" standard applies in cases such as this. In *Bise v. IBEW Local 1969,* 618 F.2d 1299 (9th Cir.1979), *cert. denied,* 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980), for example, the court expressly rejected the argument that the "some evidence" standard applied to cases involving discipline for activity protected under § 411(a)(2). The court stated:
>
> > We are unimpressed by the Union's argument that judicial review of the intra- union proceedings is precluded since the disciplinary actions taken against the plaintiffs were supported by "some evidence" of guilt. The Union's reliance on International Brotherhood of Boilermakers v. Hardeman, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971), is misplaced. Unlike the question presented in Hardeman, the infirmity is not in the procedure used or the method of discipline, but in the fact that the discipline is being imposed for an improper purpose. To adopt the Union's reading of Hardeman would have the effect of "insulat[ing] any

Union discipline of a member, so long as the charges brought against him are supported by 'some evidence', no matter how insubstantial or suspicious that evidence might be." *NLRB v. Local 294, International Brotherhood of Teamsters*, [ ] 470 F.2d [57, 62 (2nd Cir.1972) ]. We will not adopt such a reading.

*Black v. Ryder/P.I.E. Nationwide, Inc., supra,* 970 F.2d at 1467-69. The plaintiff in *Black*, as plaintiffs in this case, were disciplined for attempting to reach out to other members in an effort to recall an elected officer. The court held that courts reviewing union disciplinary action that limits a member's speech must review the union's action *de novo. Id.* 1468-69; *Petramale, supra,* 736 F.2d at 18; *Bradford v. Textile Workers Local 1093, supra.*

In this case, knowing that the LMRDA absolutely prohibits discipline directly against the recall campaign, the APA instead attacked the recall campaign collaterally, by barring plaintiffs from the members-only areas of the official web site and holding them up to the entire membership for condemnation as "dishonorable" members, for engaging in conduct that had been commonplace, and even a long-time official union practice, for many years.

    3. *Defendant Disciplined Plaintiffs Despite the Absence of an Applicable Union Rule.*

The substantive breadth of section 101(a)(2) is broader than the First Amendment, protecting from union discipline, as distinguished from potential civil liability, even defamatory speech. *Fulton Lodge No. 2 of International Association of Machinists and Aerospace Workers v. Nix,* 415 F.2d 212, 217-19 and n.17 (5th Cir. 1969), *cert. denied,* 406 U.S. 946 (1972); *Salzhandler v. Caputo,* 316 F.2d 445, 451 (2d Cir.), *cert. denied,* 375 U.S. 946 (1963) (Friendly, J.) ("So far as union discipline is concerned Salzhandler had a right to speak his mind and spread his opinions regarding the union's officers, regardless of whether his statements were true or false.").

On the other hand, section 101(a)(2) is more narrow than the First Amendment,

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page** 12

insofar as its proviso allows unions to adopt "reasonable rules" limiting speech and association rights. Union rules are valid under § 101(a)(2) "so long as they are reasonable; they need not pass the stringent tests applied in the First Amendment context." *Sadlowski, supra*, 457 U.S. at 111. [T]he courts are to play a role in the determination of reasonableness. 457 U.S. at 111-12.

An absolute requirement of section 101(a)(2) is that members' speech cannot lawfully be limited in any way, in the absence of a specific union rule. In the absence of a lawful rule, "[a] union may not infringe on free speech rights under § 411(a)(2), even if it abides by all of the due process provisions when disciplining a member for protected activity." *Black v. Ryder/P\*I\*E\* Nationwide, supra,* 970 F.2d at 1468. "For the proviso to apply, there must be an actual rule in the union's constitution or bylaws; **the proviso does not protect ad hoc action**. Additionally, the rule must have been properly enacted in accordance with the constitution and bylaws." M. Malin, INDIVIDUAL RIGHTS WITHIN THE UNION 78 (emphasis added). See *Maceira v. Pagan,* 649 F.2d 8, 16 (1st Cir. 1981); *Morrissey v. National Maritime Union of America,* 544 F.2d 19, 23-24 (2d Cir. 1976) (Friendly, J.) (*held:* policy that had not been ratified by the membership, under constitution requiring all union policies to be ratified, was not sufficient basis for invoking proviso); *Carothers v. McCarthy,* 705 F.Supp. 687, 694 (D.D.C.1989) ("defendants' justification is just that--a justification offered during the course of this litigation. It is neither a "rule" nor a "regulation," and it is not found within the Union's constitution or bylaws nor is it memorialized in any other way."); *Leonard v. M.I.T. Employees' Union,* 225 F.Supp. 937, 940 (D. Mass. 1964) ("Assuming that the union would have the right to adopt and enforce a rule temporarily limiting free expression by members of their views, arguments and opinions at the time of contract negotiations, the union here never purported to adopt any such rule, and the proviso relied upon has no application").

The section 101(a)(2) issues presented in this case involve no union rule. At the

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 13**

time of the events in this case, and also at the time that the charges were filed, the APA had "no explicit policy on the safeguarding of sensitive internal information." Verified Complaint ¶ 24 and Exh. C. Bury admitted on the appeal board hearing record that the numerical limit on at-large members' access to membership data was not embodied in any union rule, and one of the appeal board members admitted that there was no written policy defining access to membership data tagged as private.

The APA argues, citing *Hardeman,* that it needs no written rule to discipline a member for engaging in conduct that any member reasonably ought to understand is prohibited. The conduct punished in *Hardeman* was a *physical assault* upon a union representative, prompted by the member's frustration about how the representative was handling a grievance matter -- conduct that any grown person knows to be a *crime*. In the instant case, on the other hand, we are now told that plaintiffs were disciplined for accessing restricted internet data by using other members' pass codes -- conduct that was widespread among members and a long-standing practice by the APA itself, as a matter of official policy. As a matter of law, no member may reasonably be expected to know that a practice long observed by the union itself violates unwritten union rules.

More basically, the *Hardeman* analysis does not govern analysis under section 101(a)(2). Because section 101(a)(2) permits free speech rights to be revoked by a union *only* in enforcing an existing reasonable rule, all that is material in the context of section 101(a)(2) is that there is no rule. In the absence of a rule, the section 101(a)(2) proviso does not apply, and speech, including even malicious defamation, cannot be punished.

### B. Plaintiffs Are Now Suffering Deprivation of Membership Rights Based on Accusations Different Than Those Made in the Charges on Which They Were Tried and Found Guilty.

Defendant has entirely reshaped its accusations against plaintiffs, seeking to refocus the dispute from whether plaintiffs were lawfully punished on the basis of the offenses *charged,* to a defense of the appeal board's *decision* and defendant's various

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 14**

interpretations of it. Claiming that plaintiffs "misstate[d] the offense *of which they are guilty*," defendant's first brief repudiated the *charge* that plaintiffs had exceeded the numerical limits on rank-and-file access to the data base. "[T]hat rule or policy is not the rule or policy for which these two pilots were *disciplined* in this case.... APA Opp. Brief, at 11, 13 (emphasis added). In fact, John Bury, who filed and prosecuted the charges, admitted to the appeal board that the daily limit on at-large members' "look-ups" was "not written in policy anywhere." Supp. App., at 131. Defendant denied that plaintiffs were disciplined on this ground because Bury effectively admitted that discipline was legally indefensible.

In its opposition brief, defendant characterized the offense as using "deception and false pretenses to break into the union computer and its data base. [I]t can be fairly said that breaking and entry into a secure union data base with a top officer's password *and without his consent* is 'misappropriating union property.'" Opp. Brief, at 11, 13; *See also* Answer to Verified Amended Complaint (hereinafter, "Answer") ¶¶ 44(a), (b), 47(c). Plaintiffs replied with testimony by the pass code holder showing that plaintiffs' use of his pass code was actually authorized. App. 32 - Schafer decl. ¶¶ 5 - 8. The APA now argues that the "false pretenses" offense consisted simply of "breaking in" to the restricted areas of the web site under another member's pass code.

Despite defendant's post-litigation denial, plaintiffs were *charged* with and convicted of exceeding the numerical limit imposed on rank-and-file access to the data base. Bury charged that, by using a committee chair's code without the chair's authorization, plaintiffs "download[ed] volumes of member information well beyond the limit set by the Board." Verified Complaint - Exh. "B." The appeal board found that plaintiffs "bypass[ed] a system limitation and thereby gain[ed] unlimited access to member information." *Id.* - Exh. "F" (unnumbered, at "Conclusion").

The "breaking in" accusation appears nowhere in the charges. It appears for the first time in this litigation. The charges refer nonjudgmentally to "gaining access," not

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 15**

"breaking in." The offense *charged* was that plaintiffs used the pass code without authorization and to evade limits on rank-and-file access to data. A "false pretenses" accusation was charged – *but not in the sense that the APA is now using the phrase.*

The accusation in the charges was that plaintiffs

> "*gained access* to a restricted APA database containing personal and confidential membership information by using the entry code of an APA Committee Chair *without the Chair's permission or authorization.* As a result of *this deception,* they gained access to categories of private pilot information the APA's Board of Directors had declared off limits to ordinary members and employed the same deception to download volumes of member information well beyond the limit set by the Board. **Captains Pollenz and Kraller were aware of the limits the Board had placed on their access to the database in question and consciously used the Committee Chair's access codes to evade those limits.**
> **In so doing,** Captain's *[sic]* Pollenz and Kraller not only **used false pretenses to evade legitimate limitations the Board had placed on access to pilot information** but also jeopardized the confidentiality of private membership information – which the Association is honor bound to safeguard.

Verified Complaint Exh. "B" (emphasis added).

The "false pretenses" charge was that plaintiffs accessed private data inaccessible to rank-and-file members, and evaded numerical quotas applicable to rank-and-file members, by using a committee chair's pass code *without his authorization.* They were found guilty of that claimed offense, on the rationale that "[r]egardless of whether Goldberg had Schafer's permission or not, both Kraller and Pollenz had an obligation to get Schafer's permission personally. No honorable person would use a third person's confidential password without permission...." *Id.* Exh. "F" (unnumbered, at "Conclusion").

The "false pretenses" accusation now being made -- with benefit of hindsight and adjustments for the contents of plaintiffs' declarations and briefs -- is that plaintiffs logged onto the official web site under another person's employee number and pass code. It is now immaterial, according to the APA's argument at the status conference, that the

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 16**

pass code holder may have authorized the plaintiffs' use of his pass code -- evidence that proved the baselessness of the central accusation in the charges on which plaintiffs were actually tried and found guilty. It is also now immaterial to the APA that plaintiffs only unintentionally and unknowingly accessed confidential data, that they never sought this data, and that they immediately destroyed it, because their crime, as currently shaped, was their mere entry into the data base under another person's identifying code.

However, section 101(a)(5) prohibits union discipline on the basis of findings of misconduct that were not actually charged. In *Allen v. International Alliance of Theatrical, Stage Emp. and Moving Picture Mach. Operators of U. S. and Canada, AFL-CIO*, 338 F.2d 309 (5th Cir. 1964) (Wisdom, J.), the Court established what is still the governing rule: that a member may be disciplined *only* on the basis of the misconduct *actually charged*. The Court concluded that "the plaintiff did not receive that full and fair hearing to which he was entitled under the Bill of Rights provisions of the Landrum-Griffin Act," because:

> [f]air play entitles an accused to rely on the written charge made against him in preparing his defense, limits the trial to proof in support of that charge, and bars his being found guilty of an offense with which he is not charged.

338 F.2d at 315. It was immaterial, in *Allen*, that the plaintiff was actually guilty of misconduct under the union's constitution, because he had not been charged with that misconduct. Instead, he had been charged with violating a different, inapplicable provision of the constitution.

In this case, plaintiffs had no way to know that their perceived offense would later be refashioned as gaining access to the data base under another member's pass code, *despite the pass code holder's authorization.* Had plaintiffs been charged on the current accusation, they could have defended against it.[7] They offered no evidence on that

---

[7] Some of that evidence has now been filed with the Court. See Amended Verified Complaint, ¶ 47, and the declarations of Captains David Bates and J. Daniel Grever, and First Officer Robert Held.

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 17**

accusation, because it was not charged; the charge was that access was unauthorized.

If this new articulation of the "false pretenses" charge is understood to mean what the APA now claims it to mean, then the charge failed to provide plaintiffs with the fair notice of the charge, to which they were entitled under section 101(a)(5). *Jacques v. Local 1418, International Longshoremen's Association,* 246 F. Supp. 857, 859-60 (E.D. La.1965), *aff'd,* 404 F.2d 703 (5th Cir. 1969); *Addison v. Grand Lodge of the Int'l Ass'n of Machinists,* 300 F.2d 863 (9th Cir. 1962); *Gleason v. Chain Service Restaurant,* 300 F.Supp. 1241, 1250-51 (S.D.N.Y. 1969);  J. Etelson and F. Smith, *Union Discipline under the Landrum- Griffin Act,* 82 HARV.L.REV. 727, 741-43 (1968).

The appeal board decision rests on charges that plaintiffs gained "unlimited access" to the membership data base, evading the numerical daily quota on the downloading of data and accessing confidential e mail addresses, by using a committee chair's pass code without his authorization -- and no other charges.  The board found that plaintiffs "misappropriated" official data *that they did not have permission to access,*" and that they acted "contrary to the best interests of the APA as an institution" by obtaining data otherwise inaccessible to them by using a committee chair's pass code "*without his knowledge or consent.*"  Verified Complaint Exh. F (unnumbered), at "Decision."

Had the appeal board known that the APA would, when challenged in court, withdraw its accusation that evading the numerical quota constituted punishable wrongdoing, it might not have disciplined the plaintiffs.  The APA effectively asks the Court to *presume* the same outcome in its internal trial proceeding, but the Court cannot step into the appeal board's shoes and presume what the outcome would have been, had plaintiffs not been accused on this ground.[8]  The disciplinary action now rests *in some*

---

[8] It is also true that, had the board known that the committee chair actually authorized use of his pass code, it might not have disciplined plaintiffs, and that, had it known that penal action requires *mens rea,* and cannot rest on an unintended act, it might not have disciplined plaintiffs.

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 18**

*immeasurable degree* on conduct that was held by the trial body to be misconduct, but that is now admitted not to be misconduct. The discipline therefore must be set aside.

While it does not appear that the appeal board considered the accusation that is now being made by the APA, even if the board had addressed that issue in its decision, the problem would remain that the plaintiffs would have been deprived of fair notice that such an accusation was one of the charges that *they* needed to address in defending themselves.

Just as prior notice of the charges on which conviction is sought is one of the fundamental aspects of due process under the United States constitution, *Canfield Aviation, Inc. v. National Transportation Safety Board,* 854 F.2d 745, 750 (5th Cir.1988), the right to be convicted *only* on the basis of the charges actually made is a necessary aspect of the fundamental fairness to which union members are entitled under section 101(a)(5). The APA cannot now, in hindsight, massage new meaning into the charges on which plaintiffs were convicted, for the purpose of salvaging the convictions.

### IV. CONCLUSION

Plaintiffs respectfully ask this Court to preliminarily enjoin defendant to restore the *status quo ante* by removing the bar on plaintiffs' membership right to access the members-only areas of the official web site.

Respectfully submitted,

Stephen Gardner
Texas State Bar No. 07660600
Law Office of Stephen Gardner, PC
6060 North Central Expressway, Suite 560
Dallas, Texas 75206
Telephone: (214) 800-2830
Facsimile: (214) 800-2834

Barbara Harvey
Admitted *pro hac vice*
Penobscot Building, Suite 3060
645 Griswold Street
Detroit, Michigan 48226
Telephone:  (313) 963-3570
Facsimile:  (313) 963-3572

Attorneys for Plaintiffs,
By:

STEPHEN GARDNER

## CERTIFICATE OF SERVICE

Stephen Gardner, one of the attorneys for plaintiffs, hereby certifies that on June 3, 2003, he served a copy of the Plaintiffs' Renewed Motion for Preliminary Injunction, Brief in Support of Motion, and Second Supplemental Appendix on all counsel of record, by first-class mail.

STEPHEN GARDNER

**BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION, page 20**