IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JUN 2 4 2003

CLERK, U.S. DISTRICT COURT
By _____
    Deputy

**JEFFREY A. KRALLER** and
**ALAN POLLENZ,**

Plaintiffs,

v.                                                Civil Action No. 3 03CV--761P

**ALLIED PILOTS ASSOCIATION,**
a Labor Organization,

Defendant.

## DECLARATION OF TODD WISSING

First Officer Todd Wissing declares the following to be true and correct, based on personal knowledge:

1. I am employed by American Airlines as a Boeing 777 First Officer, based in New York. I currently serve as a domicile administrative assistant for the New York domicile of the Allied Pilots Association ("APA") and as a peer support volunteer for a joint American Airlines-APA "Flight Assist" program affiliated with the Aero-Medical Committee, which provides peer counseling following traumatic incidents and accidents. I served as a member of the National Communications Committee until just before the recent Tentative Agreement was released, when I voluntarily resigned my position. I have also served in the past as the Regional Coordinator for the Association's Family Awareness program, on the local communications committees for the Raleigh and New York City domiciles, on the Raleigh Strike Preparedness Committee, and as the New York jump seat coordinator.

2. As a member of the National Communications Committee, I attended Board of Directors meetings. At those meetings during the Summer of 2002, APA president John Darrah made comments to the Board and elsewhere expressing hostility to political dissenters within Association ranks. In the course of his President's Report during the August 23, 2002 Board meeting, he spoke harshly of "segment of this Board and this membership that in my mind will only be satisfied when we destroy this union, this Company, or both." Additionally, Darrah sometimes referred to a "radical faction" that was seeking similar goals.

3. At the October 15, 2002 meeting, which I attended, Darrah announced that two members had "hacked into the Association's computer" and used an unauthorized pass code to download "thousands" of e mail addresses, including private data. This discussion was held in open session. There is usually a recording made of such Board meetings. He took the position that this claimed

DECLARATION OF FIRST OFFICER TODD WISSING, page 1

offense warranted Article VII proceedings and stated that the Association intended to pursue federal charges. He then gestured to APA general counsel Ed James, who responded with an affirmative nod of his head.

4. Chicago domicile vice chair Scott Abbott then proposed a resolution calling for resolving the matter without charges. On the ground that the resolution identified the accused members by name, Darrah ruled Abbott's resolution out of order.

5. After Darrah ruled Abbott's resolution out of order, Ed James took the floor to emphasize the seriousness of the matter. He left the impression, in my opinion, that it would be unsatisfactory for the governing board to "let something like this go."

6. The Board then turned its discussion to who should handle the matter. In the course of this discussion, Miami Chair Tom Frazer took the floor and, with great agitation, told Darrah that the President could not be associated with the filing of charges, that "it's got to be someone else." The Board decided at the end of this discussion that secretary-treasurer John Bury would handle the matter. This decision was not made by formal motion.

7. I later sent Bury an e-mail, asking him to correct the minutes of the October 15th meeting to include Darrah's comments. I made the request because I wanted the record to show Darrah's disclosure that the Association was investigating whether "federal charges" could be filed against the accused members, an accusation that I considered to be reckless. Bury ignored my request.

8. The members-only areas of the Association web site contains much more information than the membership data base and the "Challenge & Response" forum. Also posted there are the minutes of all Board of Directors meetings, so all members may be informed of the Association's decisions, including up-to-date amendments to the Constitution and the Policy Manual; important notices to members about contract issues; the full Constitution; the full Policy Manual and other official Association policies; and whatever else the Association deems to be of importance to the membership. Without access to the members-only areas of the web site, the plaintiffs are unable to access the Association's notices to the membership that are posted only on the web site.

9. One such recent posting involved what is referred to as a "Master Shuffle." This was a unique, never-before implemented shuffle of the seniority list of the airline. Pilots are paid according to the weight of the aircraft they fly and these allocations are usually awarded by seniority in a "cascading" order from the larger aircraft to the next smaller aircraft. A pilot "displaced" from his larger aircraft, say the B-767, would normally "cascade" to the next largest aircraft, say the B-737, as pilots were furloughed. While a pilot may eventually end up on an even smaller aircraft, say the MD-80, he would have enjoyed the higher pay and possible lifestyle benefits from the intermediate levels of aircraft in the cascade. The Master Shuffle will suspend the "cascade rights" for all pilots and immediately displace the pilot to the eventual, smallest aircraft. All members received a blast e mail message on May 24, 2003 from APA Communications Director Gregg Overman, alerting us that information about an upcoming Master Shuffle had been posted in the members-only area of the web site. The blast e mail message came with the following prominent warning: "Warning: Failure to Read and Understand the Following Could Materially Affect Your Economic Future!" To my knowledge, the referenced document was made available by the Association only on its web site. I

did not receive a hard copy of it by conventional mail. Consequently, due to the unique nature of this massive seniority shuffle, plaintiffs remained ignorant of this information, which by its own assessment, the APA considered to be of vital economic importance to all members. For example, without knowing the mechanics of the Master Shuffle, Captains Pollenz and Kraller could be unnecessarily placed in an aircraft/domicile bid status that could cause them thousands of dollars in lost wages per year as well as onerous, incompatible work schedules and other severe lifestyle and monetary hardships. Having no previous experience with such a shuffle, and lacking guidance from the Association, they had no way to bid their best interests. The Master Shuffle ended at the end of May, 2003.

Under penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746, I declare that the foregoing is true and correct to the best of my knowledge.

                                                First Officer Todd Wissing

Dated: June 22, 2003